**FILED**
**CLERK**

5/17/2016 3:27 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

ARLINE MAGNUSSON,

                  Plaintiff,

    -against-

COUNTY OF SUFFOLK, KEVIN SPENCE,
and ROBERT BECK, each in their individual
and official capacities,

                  Defendants.
----------------------------------------------------------X

**ORDER**
14-CV-3449 (SJF)(ARL)

FEUERSTEIN, J.

       Plaintiff Arline Magnusson ("Plaintiff") filed an amended complaint alleging that

defendants County of Suffolk (the "County"), Kevin Spence ("Spence"), and Robert Beck

("Beck") (collectively, "Defendants") created a hostile work environment on the basis of gender

during her employment with the County Department of Public Works ("DPW") in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"), retaliated

against her after she filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") in violation of Title VII, and violated her Fourteenth Amendment Equal

Protection rights, enforceable via 42 U.S.C. § 1983.[1]  Defendants filed a motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56.  For the following reasons,

Defendants' motion is granted in its entirety.

---

[1] Plaintiff asserts her Title VII hostile work environment and retaliation claims against the County only, and her Section 1983 claim against all Defendants.  (*See* Am. Compl. (Dkt. 15) at ¶¶ 52-72).  Plaintiff's amended complaint also contains a claim that Defendants violated her First Amendment freedom of speech rights (*see id.* at ¶¶ 73-80), but Plaintiff has since withdrawn that claim.  (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated November 20, 2015 ("Pl. Opp.") (Dkt. 39-33), at 2).

# I.    BACKGROUND [2]

## A.    The Individual Parties and Their Roles at the DPW

Plaintiff, a fifty-six (56)-year-old woman who identifies as gay, is currently employed by the DPW in the position of Custodial Worker ("CW") III. (Declaration of Arline Magnusson, dated November 20, 2015 ("Pl. Decl.") (Dkt. 39-31), at ¶¶ 4, 12; Plaintiff's Responses to Defendants' Statement Pursuant to Local Civil Rule 56.1 and Counterstatement of Material Facts, dated November 20, 2015 ("Pl. 56.1 Stmt.") (Dkt. 39-34), at ¶ 1). Plaintiff began her employment with the DPW in 2000 as a CW I. (Pl. 56.1 Stmt. ¶ 2). In 2005, Plaintiff was promoted to CW II with Spence's approval. (*Id.* ¶ 23). Plaintiff's duties as a CW I and CW II consisted of "all aspects of cleaning multiple [County] buildings, which included garbage removal, vacuuming, mopping, dusting, cleaning bathrooms, ordering and delivering supplies and shoveling snow." (Pl. Decl. ¶¶ 6, 9).

In 2008, Plaintiff was promoted to CW III with Beck's approval. (Pl. 56.1 Stmt. ¶ 24). Plaintiff's duties as a CW III consist of the same duties she performed as a CW I and CW II, as well as certain supervisory duties. (Pl. Decl. ¶ 13). On July 1, 2012, Plaintiff's CW III position was eliminated in connection with widespread layoffs of County employees (including sixty-five (65) DPW employees), and she was "bumped" (*i.e.*, demoted) to a CW I position. (*Id.* ¶¶ 25-26; Affidavit of Mary Jane Walker, dated October 14, 2015 ("Walker Aff.") (Dkt. 39-22) at ¶¶ 10-13). In January 2013, Plaintiff submitted a written application to be restored to a CW III

---

[2] The relevant facts are taken from the parties' deposition transcripts, declarations, exhibits, and Local Rule 56.1 statements, and disputes regarding the facts are noted. "In setting forth the facts underlying this [order], [the Court] construe[s] the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [her] favor." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 601 (2d Cir. 2006) (internal quotations omitted).

position, which Beck signed, and Plaintiff was restored to a CW III position effective April 15, 2013.  (Pl. 56.1 Stmt. ¶¶ 27-30; Walker Aff. ¶ 14).

Spence worked for the DPW from 1974 until his retirement in June 2012.  (Pl. 56.1 Stmt. ¶¶ 12-13).  Between 1991 and 2001, Spence was a CW III.  (*Id.* ¶¶ 14-15).  Between 2001 and August 2010, Spence was the Assistant Director of Custodial and Security Services.  (*Id.* ¶ 15).  Between August 2010 and his June 2012 retirement, Spence served as the Director of Custodial and Security Services, with duties including overseeing the daily operations of cleaning and building maintenance and managing CWs, but not including interviewing, hiring, demoting, or terminating employees.  (*Id.* ¶¶ 15-17).  As a CW I and CW II, Plaintiff reported to Spence indirectly, through her direct supervisors.  (Pl. Decl. ¶¶ 7, 10).  Plaintiff began reporting to Spence directly in 2008 when she was promoted to CW III, and did so until Spence was promoted to Director of Custodial and Security Services in August 2010.  (*Id.* ¶ 14).

Beck joined the DPW as a CW I in 1986.  (*Id.* ¶ 18).  Beck was promoted to CW II in 2003, CW III in 2004, and to Assistant Director of Services and Public Safety in 2010.  (*Id.* ¶¶ 19-21).  Since Spence's retirement in June 2012, Beck has acted in the capacity of Director of Custodial and Security Services, but has maintained the Assistant Director title.  (Pl. Decl. ¶ 16).  From 2005 to 2008, and again from August 2010 to the present, Plaintiff has reported directly to Beck.  (*Id.* ¶¶ 8, 10, 15).

**B.      The Alleged Hostile Work Environment**

Plaintiff first informed her DPW co-workers and supervisors of her sexual orientation in 2014.  (*Id.* ¶¶ 4, 27).  Plaintiff describes her physical appearance as follows: she always wears jeans and either a t-shirt or white button-down shirt to work; she has had short hair for most of her time with the DPW; she always wears work boots to work; she keeps her wallet in her jeans

pocket rather than her purse; she never wears makeup at work, and only rarely outside of work; and she wears a pant suit with a blazer to work-related events, but never a dress. (*Id.* ¶¶ 19-24). Plaintiff says that other female DPW employees wear makeup to work, have long hair, carry purses, and wear "women's sneakers or similar women's shoes at work." (*Id.* ¶ 25).

According to Plaintiff:

- In March 2003, Spence "started telling [Plaintiff] that [she] needed to lose weight to look more like a woman," "insisted that [Plaintiff] come to his office and get weighed to see 'how overweight' [she] was," and upon Plaintiff's refusal "started calling [her] at home about it." (*Id.* ¶ 34; Transcript of Deposition of Arline Magnusson taken on May 13, 2015 ("Pl. Depo. Tr.") (Dkt. 39-4) at 56:16 – 57:4). Spence testified that, after he had "come up with the idea of a weight loss program" involving multiple DPW employees and had himself "lost 30 pounds in 30 days," Plaintiff approached him about weight loss and requested his assistance. (Transcript of Deposition of Kevin Spence taken on May 19, 2015 ("Spence Depo. Tr.") (Dkt. 39-6) at 66:2-70:6).

- On the night of April 28, 2003, Plaintiff was assigned to clean a County building that Spence worked in. While there, Spence directed Plaintiff to follow him into a conference room, which she did. In the conference room, Spence "ordered [Plaintiff] to take off [her] shirt and pants and strip down to [her] underwear," which, "[i]n a state of shock," Plaintiff did. Spence then proceeded to take pictures of Plaintiff in her undergarments, measure various body parts with a measuring tape, and write down the measurements on a sheet of paper for approximately thirty (30) to forty-five (45) minutes. At the conclusion of this "weigh-in" session, Plaintiff says that she "broke down hysterically crying and ran out of the building." (Pl. Decl. ¶¶ 35-41; Pl. Depo. Tr. 56:16 – 64:25). Spence characterizes the pictures of Plaintiff and handwritten measurements that were generated as a result of this incident (*see* Pl. Decl. Exs. 1-2 (Dkt. 39-32) as being part of a "weight loss contest in the office," whereby Plaintiff "had to be photographed in a sports bra and bathing suit bottom," after Plaintiff had "heard that [Spence] had dropped 30 pounds in 30 days," and "asked [him] to help her set up a [weight-loss] chart." (Spence Depo. Tr. at 14:16-15:5).

- "In 2005, [ ] Beck said [Plaintiff's] practice of carrying [her] wallet in [her] back pocket is 'gay,' and that as a woman, [she] should carry [her] money in a pocketbook." (Pl. Decl. ¶ 28). Beck denies having ever made any inquiries or comments regarding Plaintiff's sexual orientation. (Transcript of Deposition of Robert Beck taken on May 20, 2015 ("Beck Depo. Tr.") (Dkt. 39-5) at 64:16-21).

- "In or around 2006 or 2007, … Beck started asking [Plaintiff] if [she] was 'one of those gay people.'" (Pl. Decl. ¶ 29). Beck denies having ever made any inquiries or comments regarding Plaintiff's sexual orientation. (Beck Depo. Tr. at 64:16-21).

- "[I]n or around 2007, … Beck started asking [Plaintiff] whether [she] had a boyfriend or a girlfriend.  When [Plaintiff] did not answer him, … Beck badgered [her] about the issue, insisting that he would 'figure [her] out.'"  (Pl. Decl. ¶ 30).  Beck denies having ever made any inquiries or comments regarding Plaintiff's sexual orientation.  (Beck Depo. Tr. at 64:16-21).

- In February 2010, in "yet another attempt to ascertain [Plaintiff's] sexuality," Beck "asked to take [Plaintiff] to Atlantic City for the weekend."  (Pl. Decl. ¶ 51).  In her written declaration, Plaintiff stated that she and Beck were "alone together in the truck" when he asked, that it was a "romantic advance[ ]" (*id.* ¶ 52), and that "it was apparent that … Beck was asking [her] on a date."  (*Id.* ¶ 51).  Plaintiff contends that, "[a]fter [she] refused … Beck's romantic advances, the very next day … Beck, together with … Spence, had [her] transferred from [her] then assignment at [one building], which provided ample opportunity to earn overtime compensation, to [another building], which provided almost no opportunity for overtime."  (*Id.* ¶ 52).  During her deposition, Plaintiff testified that another DPW employee was present, and that there was no basis for her to believe that Beck was asking her to accompany him on a romantic trip.  (Pl. Depo. Tr. 91:14-93:5).  Beck contends this conversation was about a proposed trip involving a group of DPW employees, and that he did not ask Plaintiff to accompany him to Atlantic City alone.  (Beck Depo. Tr. at 76:14-77:9).

- Between "[a]s early as 2002" and "as recently as November 2010," in an effort to "goad [Plaintiff] to discuss [her] sexuality," Beck and/or Spence "falsely stat[ed] that [Plaintiff] ha[s] had sexual affairs with co-workers."  (Pl. Decl. ¶ 49).  Beck denies ever stating that Plaintiff was romantically involved with any of her DPW co-workers.  (Beck Depo. Tr. at 65:17-70:23).  Spence testified that he reported that DPW employee John Cullen, who passed away in or about 2010, had sent Plaintiff a number of cards and letters to his two (2) immediate supervisors and had reassigned Mr. Cullen and Plaintiff so that they would no longer work together, but was not aware of Plaintiff having had a romantic relationship with any County employee.  (Spence Depo. Tr. at 60:2-63:7; 65:2-13).

- In March 2011, when Plaintiff started wearing a "friendship ring," Beck asked "whether it was 'a gay thing'" in front of Plaintiff's co-workers, prompting Eddie Beck, a CW II and defendant Beck's brother, to "repeatedly mock[ ] [Plaintiff's] ring as 'gay.'"  (Pl. Decl. ¶¶ 31-32).  Beck denies having ever made any inquiries or comments regarding Plaintiff's sexual orientation.  (Beck Depo. Tr. at 64:16-21).

- "In May 2012, shortly before … Spence retired, … Spence and Beck … showed each other, as well as other co-workers graphic photos of the Plaintiff" from the April 28, 2003 incident discussed above.  (Am. Compl. ¶ 38).  In her interrogatory responses, Plaintiff identified Mark Patrizio, a CW III, and Joan Neiman, a CW I, as the "other co-workers" who were shown these pictures on the basis that they "told Plaintiff that individual Defendants [Spence and Beck] showed [them] the graphic photos."

(Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories, dated March 12, 2015 (Dkt. 39-9), at 8). Spence testified that he has not been in possession of any copies of these pictures since shortly after the incident in 2003, when he gave them to Plaintiff. (Spence Depo. Tr. at 85:22-87:22). Beck testified that he had never seen the pictures at issue prior to this litigation. (Beck Depo. Tr. at 78:22-79:9). Mr. Patrizio and Ms. Neiman each deny having ever seen any photos of the Plaintiff wearing undergarments, or any otherwise "graphic" photos of Plaintiff. (*See* Affidavit of Mark Patrizio, dated October 2, 2015 (Dkt. 39-23), ¶¶ 4-6; Affidavit of Joan Neiman, dated October 2, 2015 (Dkt. 39-24), ¶¶ 4-6).

Plaintiff alleges that she has endured the foregoing treatment by defendants Spence and Beck during the course of her DPW employment "because of the way [she] look[s], which does not conform to the appearance of a stereotypical heterosexual female" (*Id.* ¶ 29), and Spence and Beck (as applicable) offer their own assessments of these allegations.

### C.    The County's Sexual Harassment Reporting Procedure

Throughout Plaintiff's tenure with the DPW, the County has maintained a discrimination and sexual harassment policy, pursuant to which, *inter alia*, "[a]nyone who believes that … she is the victim of discrimination or sexual harassment should report the discrimination or harassment to the person selected by … her Department Head as the 'departmental designee' (or where the alleged offender is the Department Head or designee, to the Chief Deputy County Executive/General Counsel)…" (Pl. 56.1 Stmt. ¶¶ 5-6; Declaration of Richard H. Weinschenk, dated October 16, 2016 ("Weinschenk Decl.") (Dkt. 39-1), Ex. M at D-262). Throughout Plaintiff's tenure with the DPW, Mary Jane Walker has been the DPW's designated discrimination / sexual harassment officer to whom complaints are to be directed. (Pl. 56.1 Stmt. ¶ 7). In June 2000, upon the commencement of her employment with the DPW, Plaintiff signed a document stating that she had received a copy of the County's "Affirmative Action / Sexual Harassment Policies," among other things, and understood that it was her "responsibility to read the materials and acquaint [herself] with their contents." (*Id.* ¶ 8; Weinschenk Decl., Ex. K).

Each time the County's written discrimination / sexual harassment policy was amended, all employees, including Plaintiff, received a copy of the updated policy with their paycheck. (Pl. 56.1 Stmt. ¶ 8).[3] Additionally, following a March 2004 meeting with representatives from her union to discuss the April 2003 body measurement / photo session with defendant Spence, Plaintiff received a letter from the union's vice president instructing her to contact Ms. Walker "[s]hould [she] choose to go forward" with a sexual harassment complaint. (Weinschenk Decl., Ex. N; Pl. Depo. Tr. at 51:7-52:6). Plaintiff never complained to Ms. Walker regarding sexual harassment and/or discrimination or otherwise filed any complaint with the County. (Pl. 56.1 Stmt. ¶ 10; Affidavit of Mary Jane Walker, dated October 14, 2015 ("Walker Aff.") (Dkt. 39-22), ¶ 8).

### D.     Plaintiff's EEOC Charge and the Alleged Retaliation

On August 19, 2011 Plaintiff filed a charge of discrimination concerning the above events with the EEOC. (Pl. Decl. ¶ 54; Weinschenk Decl., Ex. F). Plaintiff alleges that, following her commencement of the EEOC proceeding, she was subjected to three (3) types of retaliatory conduct.

First, Plaintiff alleges that she was offered fewer opportunities to earn overtime compensation than certain other DPW custodial employees, including employees who are less senior than her. (Pl. Decl. ¶¶ 56-60; Pl. 56.1 Stmt. ¶¶ 32, 38). Beck, who is responsible for issuing overtime assignments to CWs, testified that overtime assignments are made on the basis of various factors, including seniority (with more senior employees typically working fewer overtime hours during the course of a year than less senior employees), knowledge of the

---

[3] Defendant's Rule 56.1 Statement erroneously contains two paragraphs bearing the number "8" – one preceding number 9 and one following it. Plaintiff replicated and noted this mistake in her own 56.1 statement. This reference is to the number 8 that incorrectly appears after number 9.

building in which overtime services are required, and employee availability. (Beck Depo. Tr. at 39:4-42:6). In 2011, Plaintiff was a CW III for the entire year and earned approximately ten thousand, eight hundred and eighty dollars and twenty-five cents ($10,880.25) in overtime compensation. (Pl. 56.1 Stmt. ¶ 38). That same year, three (3) male CW IIIs earned more overtime compensation than Plaintiff and (2) male CW IIIs earned less overtime compensation than Plaintiff. (*Id.* ¶¶ 38-40). In 2012, Plaintiff worked as both a CW III and a CW I, and earned a total of six thousand, four hundred and twenty-three dollars and eighty-five cents ($6,423.85) in overtime compensation ($207.00 as a CW III and $6,216.85 as a CW I). (*Id.* ¶ 42). That same year, Sherman Trent and Justin Kolb, two male DPW employees who were similarly demoted from CW III to CW I in connection with County-wide layoffs, earned a total of six thousand, eight hundred and eighty-three dollars and sixty-seven cents ($6,883.67) and four thousand, nine hundred and ninety-five dollars and sixty-eight cents ($4,995.68), respectively. (*Id.* ¶¶ 43-46). Between January 2013 and October 2013, a period in which Plaintiff worked first as a CW I and subsequently as a CW III, she earned a total of eleven thousand, three hundred and forty-eight dollars and eighty-eight cents ($11,348.88) in overtime compensation. (*Id.* ¶ 47). During this same period, one (1) male CW III and one (1) male CW I earned more overtime compensation than Plaintiff, and two (2) male CW IIIs earned less overtime compensation than Plaintiff. (*Id.* ¶¶ 47-49).

Second, Plaintiff alleges that on February 9, 2012, approximately six (6) months after she filed her EEOC charge and five (5) weeks after she had been deposed by a County attorney in connection with her EEOC allegations, the County retaliated against her when Spence issued her a written reprimand for using a County vehicle to attend a union meeting during her scheduled work hours and recording her time spent at the meeting as work time. (Pl. Decl. ¶¶ 61-62). The

written reprimand was placed in her permanent personnel file. (*Id.* ¶ 67). Plaintiff contends that she began working prior to her usual start time and worked all of the hours she was scheduled to work. (*Id.* ¶ 62). Plaintiff also contends that, since she began working for the DPW in 2000, she had "regularly and openly used County vehicles to attend Union meetings as had other DPW workers," and that "[p]rior to February 2012, no one had stated that this practice was improper … [or] disciplined [her] for this practice." (*Id.* ¶ 64). According to Plaintiff, other DPW employees "regularly use County vehicles to attend union meetings and are not disciplined." (*Id.* ¶ 65). Spence testified that rules regarding the use of County vehicles were "brought up routinely at foreman meetings," but that he had not previously discussed with Plaintiff the specific issue of using County vehicles to attend union meetings. (Spence Depo. Tr. at 91:22-92:44). Spence also testified that, to his knowledge, this was the first time that Plaintiff had used a County vehicle to attend a union meeting, that he had never written up anyone else for using a County vehicle to attend a union meeting, and that he was not aware of any other CWs who had been disciplined for using a County vehicle to attend a union meeting. (*Id.* at 82:19-85:6). Beck testified that he had previously taken a County vehicle to union meetings, but that he had "called [his] superior and asked if that was okay" before doing so, and that he had seen other DPW employees bring County vehicles to union meetings, but that they were not CWs and thus not within the scope of his authority. (Beck Depo. Tr. at 80:7-83:4).

Third, Plaintiff claims that a purported delay in her restoration to a CW III position following her temporary demotion to CW I was an act of retaliation. (*See* Am. Compl. ¶¶ 44, 47-48, 60; Pl. Opp. At 9-10, 19). In July 2012, the County laid off approximately three hundred and twenty-eight (328) municipal employees, including sixty-five (65) DPW employees. (Walker Aff. ¶¶ 10-11). In connection with these layoffs, Plaintiff's CW III position was

eliminated and Plaintiff was demoted to a CW I position. (*Id.* ¶ 12; Pl. 56.1 Stmt. ¶¶ 25-26).

Nine (9) custodial employees with the DPW, including Plaintiff, were demoted to lower-level

CW positions. (Walker Aff., Ex. 1 at D-844). On January 29, 2013, Plaintiff submitted a "desk

audit" in order to be restored to the position of CW III, and on April 15, 2013, Plaintiff was

reinstated in a CW III position. (Pl. 56.1 Stmt. ¶¶ 27, 30). Beck signed Plaintiff's "desk audit,"

attesting to the accuracy and completeness of the information she provided. (*Id.* ¶ 29). Plaintiff

now concedes that the July 2012 demotion to CW I was not itself an act of retaliation. (*See* Pl.

Opp. at 19). However, Plaintiff contends that, though she ultimately learned that she could

submit her "desk audit" herself, "[t]he normal procedure for an employee to be promoted is for

the employee's supervisor to submit a desk audit," and that in December 2012 Beck falsely

informed her that he had submitted it, thus delaying her application to be reinstated to CW III.

(Pl. Decl. ¶ 70). This delay in her reinstatement to CW III, Plaintiff contends, constitutes an act

of retaliation. (*See* Pl. Opp. at 19).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate only where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law," *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006)

(quoting Fed. R. Civ. P. 56(c)), and "where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party." *Belton v. City of New York*, 629 Fed. App'x 50,

50 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)). A district court "is not to weigh the evidence but is instead required to view the

evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations omitted).

In order to defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts… [She] must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita*, 475 U.S. at 586-87) (emphasis in original); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) ("opposing party must provide concrete particulars showing that a trial is needed") (internal quotations omitted). "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

With regard to summary judgment in employment discrimination cases specifically, the Second Circuit has said:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano*, 445 F.3d at 603 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### B. Statute of Limitations

A plaintiff asserting Title VII claims must file an administrative charge with the EEOC within three hundred (300) days of the discriminatory act or practice. *See* 42 U.S.C. § 2000e-5(e)(1); *De La Peña v. Metropolitan Life Ins. Co.*, 953 F. Supp. 2d 393, 406 (E.D.N.Y. 2013). The statute of limitations for Section 1983 claims is three (3) years. *See, e.g., Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 209 (E.D.N.Y. 2014). Accordingly, Plaintiff's Title VII claims concerning events that occurred prior to October 23, 2010 (three hundred (300) days before Plaintiff filed her EEOC charge on August 19, 2010) and her Section 1983 claims concerning events that occurred prior to June 2, 2011 (three (3) years before Plaintiff filed her complaint in this action on June 2, 2014) are time-barred absent application of the "continuing violation" doctrine.

"In rare cases, a 'continuing violation' exception may be observed under which, 'if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'" *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 831 (S.D.N.Y. 2013) (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)). "Since '[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,' the entire time period of the alleged hostile environment 'may be considered by a court for the purposes of determining liability' if 'an act contributing to the claim occurs within the filing period.'" *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 442-43 (E.D.N.Y. 2013) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). In a hostile work environment case where the plaintiff alleges that more recent acts are part of a continuing violation, the Court must

"determine whether the acts about which the employee complains are part of the same actionable hostile work environment practice." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 120). Thus, a court must "make an individualized assessment of whether incidents and episodes are related." *Id.* A "sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." *Id.* at 77.

The continuing violation doctrine applies similarly to Section 1983 employment discrimination actions: claims regarding events that would otherwise be untimely may be considered only if they are sufficiently related to claims regarding events occurring within the limitations period. *See, e.g., Frankel v. New York Office of Children & Family Servs.*, 11-cv-7973, 2015 WL 1290973, at *3 n.3 (S.D.N.Y. Mar. 23, 2015) ("The *Morgan* decision analyzed Title VII claims and was based on the language of Title VII itself… Courts have nonetheless applied this analysis in the context of Section 1983 claims.") (internal citations omitted); *Richards v. City of New York*, No. 05-cv-1163, 2007 WL 1030294, at *9 (S.D.N.Y. Mar. 30, 2007) ("The Second Circuit has applied the continuing violations doctrine to claims under § 1983, and the law relating to continuing violations under Title VII has traditionally been held to apply by analogy to § 1983 claims.") (internal quotations and citations omitted).

## III. DISCUSSION

### A. Timeliness of Claims

Accepting all of Plaintiff's allegations as true and construing them in the light most favorable to her, the mistreatment that Plaintiff endured at the DPW may be categorized as 1) sexual harassment, and 2) sexual orientation harassment.

As to the first category, on April 28, 2003, Spence took pictures of Plaintiff in her undergarments and took measurements of Plaintiff's body. More than nine (9) years later, in May 2012, he showed the pictures to Beck and DPW co-workers Patrizio and Neiman. According to Plaintiff, Spence showed these pictures to others in May 2012, which is within both the Title VII and Section 1983 limitations periods, and they are the very same pictures that Spence took in April 2003. Thus, the April 2003 picture-taking incident and the alleged May 2012 dissemination are sufficiently related to consider both events for the purposes of this motion, notwithstanding the fact that nothing similar or related is alleged to have occurred during the intervening nine (9) years. "Under *Morgan*, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related. '[I]t does not matter whether nothing occurred within the intervening [ ] days so long as each act is part of the whole.'" *McGullam*, 609 F.3d at 77 (quoting *Morgan*, 536 U.S. at 118).

As to the second category, on several occasions between "as early as 2002" and as recently as March 2011, Beck inquired and/or speculated about Plaintiff's sexual orientation in an offensive manner, and Beck and/or Spence stated that Plaintiff had been romantically involved with DPW co-workers in an effort to induce Plaintiff to discuss her sexual orientation. According to Plaintiff, the most recent incident of sexual orientation harassment occurred in March 2011, when Beck questioned whether her "friendship ring" was "a gay thing." Because this incident occurred within the Title VII limitations period (after October 23, 2010) and it is sufficiently related to the prior alleged incidents of Beck commenting and/or speculating upon Plaintiff's sexual orientation in an offensive manner so as to invoke the "continuing violation" doctrine, the Court will consider all of the alleged incidents of sexual orientation harassment in

connection with Plaintiff's Title VII claims. However, this March 2011 "friendship ring" incident occurred outside of the Section 1983 limitations period (before June 2, 2011), and none of the alleged incidents of questioning / commenting upon Plaintiff's sexual orientation are sufficiently related to Spence's alleged display of "graphic" photos of Plaintiff in May 2012 to be considered under the "continuing violation" doctrine. *Compare Caravantes v. 53rd St. Partners, LLC*, No. 09-cv-7821, 2012 WL 96474, at *7-8 (S.D.N.Y. Jan. 12, 2012) (continuing violation doctrine applied where campaign of harassment began with sexual touching and escalated to genital groping and oral sex because "the genital groping and oral intercourse began prior to the statutory time period and persisted"), *and Lamar v. Inst. for Family Health*, No. 09-cv-1154, 2011 WL 2432925, at *9 (N.D.N.Y. June 16, 2011) (continuing violation doctrine applied to series of acts by offender with whom plaintiff had previously had an extramarital affair because each act was based on plaintiff's gender and "motivated by [offender's] jealousy and need to control" plaintiff), *with Russo,* 972 F. Supp. 2d at 444-45 (continuing violation doctrine did not apply where there was no evidence that comments made within the limitations period, though "vulgar and offensive," were "related to the prior incidents [of sexual harassment] or that the remarks were gender based"). Accordingly, Plaintiff's claims that are premised on alleged incidents of sexual orientation harassment are time-barred under Section 1983.

### B.    Title VII – Hostile Work Environment [4]

#### 1.    Hostile Work Environment Standard

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory

---

[4] Plaintiff is not asserting Title VII hostile work environment claims against individual defendants Spence or Beck (*see* Am. Compl. ¶¶ 55, 61), and in any event "individuals are not subject to liability under Title VII." *Patterson*, 375 F.3d at 221 (internal quotations and citations omitted). Accordingly, the Court only considers Plaintiff's Title VII claims with respect to the County.

intimidation, ridicule, and insult… that is sufficiently severe to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 20 (2d Cir. 2012). "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Id.* (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). The "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Abusive conduct in the workplace is only actionable under Title VII "when it occurs because of an employee's … *protected characteristic*…" *Rivera*, 743 F.3d at 20 (internal quotations omitted) (emphasis in original). Accordingly, "[a] hostile work environment claim based on sex discrimination requires evidence that 'the hostile or abusive treatment was *because of* … sex.'" *Harris v. New York State Dep't of Correctional Services*, 616 Fed. App'x 453, 455 (2d Cir. 2015) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012)) (emphasis in original).

2.      **Sexual Orientation Harassment**

As discussed above, all of the alleged incidents of sexual orientation harassment are considered in connection with Plaintiff's Title VII claims under the continuing violation doctrine. These incidents, however, do not give rise to Title VII liability. Plaintiff alleges: (i) in 2005, Beck told Plaintiff that the practice of carrying her wallet in her back pocket is "gay"; (ii) in 2006 or 2007, Beck asked Plaintiff if she was "one of those gay people"; (iii) in 2007, Beck

asked Plaintiff "whether [she] had a boyfriend or a girlfriend" and "insist[ed] that he would figure [her] out"; (iv) in February 2010, in "yet another attempt to ascertain [Plaintiff's] sexuality… [Beck] asked to take [Plaintiff] to Atlantic City for the weekend"[5]; (v) at unspecified times between "as early as 2002 [and] as recently as November 2010," Beck and/or Spence "falsely stat[ed] that [Plaintiff] ha[s] had sexual affairs with co-workers" in an attempt to "goad [Plaintiff] to discuss her sexuality"; and (vi) in March 2011, Beck asked Plaintiff whether her "friendship ring" was "a gay thing."  According to Plaintiff herself, each of these alleged incidents was motivated by a desire to harass her on the basis of her sexual orientation, not her gender.

Sexual orientation discrimination is not actionable under Title VII, and plaintiffs may not shoehorn what are truly claims of sexual orientation discrimination into Title VII by framing them as claims of discrimination based on gender stereotypes, as Plaintiff at times attempts to do here.  *See, e.g., Dawson v. Bumble & Bumble*, 398 F.3d 211, 217-18 (2d Cir. 2005) (noting that Title VII does not prohibit sexual orientation discrimination and "[l]ike other courts, we have … recognized that a gender stereotyping claim should not be used to 'bootstrap protection for sexual orientation into Title VII.'") (quoting *Simonton v. Runyon*, 232 F.3d 33, 38 (2d Cir. 2000)).  Accordingly, Plaintiff's claims regarding incidents of harassment based on her sexual orientation do not give rise to Title VII liability.

---

[5] During her deposition, Plaintiff testified that Beck and other DPW employees had gone to Atlantic City together on a group trip before, that another DPW employee was present when Beck asked her to go to Atlantic City, that she had no basis to believe this was a romantic proposition, and that she did not respond to the request one way or the other or otherwise complain about it to anyone, contradicting much of the account of this event set forth in the amended complaint.  In light of this, a jury could not reasonably conclude that this anodyne incident constituted an act of sexual harassment, and the Court will consider it only as part of Plaintiff's sexual orientation harassment narrative.

### 3. Sexual Harassment

Remaining for consideration are the April 2003 photo and body measurement session conducted by Spence, allegedly under coercive circumstances, and his alleged display of those photos to Plaintiff's co-workers Beck, Patrizio, and Neiman more than nine (9) years later, in May 2012. The question is whether or not these incidents, taken together, are "sufficiently severe to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Rivera*, 743 F.3d at 20. The Second Circuit has instructed district courts to consider "the totality of the circumstances, including: the *frequency of the discriminatory conduct*; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it *unreasonably interferes with the victim's [job] performance*." *Id.* (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (emphasis added).

There is little doubt that a jury might reasonably conclude that a male supervisor subjecting a subordinate female employee to a scantily-clad photo and body-measurement session under coercive circumstances and then showing those photographs to co-workers, as Plaintiff alleges occurred, is both severe and humiliating. However, these two (2) alleged incidents occurred more than nine (9) years apart, and there are no credible allegations that these remote events "unreasonably interfered with [Plaintiff's] job performance," from either a subjective or objective viewpoint. Indeed, Plaintiff elected not to pursue any complaints against Spence following the April 2003 incident, proceeded to work under his supervision for the next nine (9) years without any alleged incidents of sexual harassment, and earned two (2) promotions during that period. In these circumstances, a jury could not reasonably conclude that these events, occurring nine (9) years apart, were "sufficiently severe to alter the conditions of [Plaintiff's] employment and create an abusive working environment" from either an objective or

subjective standpoint, and summary judgment in favor of Defendants on Plaintiff's hostile work environment claim is appropriate. *See, e.g., Quinn v. Green Tree Credit*, 159 F.3d 759, 768 (2d Cir. 1998) (affirming grant of summary judgment in favor of defendants where plaintiff's timely claims included allegations that boss had "deliberately touched [her] breasts with some papers that he was holding" and informed plaintiff that she had been voted the " 'sleekest ass' in the office."); *Husser v. New York City Dept. of Educ.*, No. 12-cv-6095, 2015 WL 5774741, at *17-20 (E.D.N.Y. Sept. 30, 2015) (granting summary judgment in favor of defendants where hostile work environment allegations consisted of ten (10) sexually inappropriate incidents over the course of three (3) years, including defendant discussing the size of his genitalia with and mouthing the words "blow me" to plaintiff); *Geller v. N. Shore Long Island Jewish Health Sys.*, No. 10-cv-0170, 2013 WL 5348313, at *7 (E.D.N.Y. Sept. 23, 2013) (granting summary judgment in favor of defendants where alleged sexual harassment consisted of approximately twenty (20) incidents over the course of five (5) years, including comments about plaintiff's breasts, uninvited touching of plaintiff's leg, drawing a penis on a whiteboard during a meeting, and individual defendant telling plaintiff he could see through her shirt); *Trinidad v. New York City Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (granting summary judgment in favor of defendants where there were isolated incidents over the course of five (5) years, including defendant calling plaintiff a "bitch" and making inappropriate sexual remarks); *Augustin v. Yale Club of New York City*, No. 03-cv-1924, 2006 WL 2690289, at *21-22 ("four or five" comments over the course of five (5) years, including defendants calling plaintiff a "black bitch" and a "fucking negrita," insufficient to sustain a hostile work environment claim).

Accordingly, a reasonable jury could not find that Plaintiff endured a hostile work environment on the basis of her gender, and summary judgment in favor of Defendants on Plaintiff's Title VII hostile work environment claim is appropriate.

### 4. Plaintiff's Failure to Follow the County's Grievance Procedures

"An employer may defend against [a hostile work environment claim] by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). The record is clear that (i) the County has maintained a sexual harassment policy for the entire term of Plaintiff's employment, pursuant to which any incidents of sexual harassment within the DPW are to be reported to Mary Jane Walker; (ii) Plaintiff received documents instructing her of the DPW's sexual harassment reporting procedures, from both the DPW on multiple occasions and her own union; and (iii) Plaintiff never contacted Ms. Walker regarding or otherwise provided appropriate County employees with any notice of the alleged incidents of harassment before initiating the EEOC action. Accordingly, even if Plaintiff had an otherwise viable hostile work environment claim, the County could not be held liable under Title VII. *See id.; see also Kennedy v. J.P. Morgan Chase & Co.*, 325 F. Supp. 2d 401, 410 (S.D.N.Y. 2004) (granting defendants' motion for summary judgment on plaintiff's hostile work environment claim where plaintiff had received a copy of the company's grievance policy, notwithstanding plaintiff's allegation "that he was not aware of the 'exact details' of [the] grievance policy").

## C.    Section 1983 – Equal Protection

"[T]he standards applicable to the conduct alleged to constitute hostile work environment in violation of Title VII are also applicable to [a plaintiff's] … equal protection claims under § 1983." *Patterson*, 375 F.3d at 225.  As discussed above, Plaintiff does not have a viable Title VII hostile work environment claim.  Accordingly, Plaintiff does not have a viable hostile work environment claim under Section 1983 either, and summary judgment in favor of Defendants on Plaintiff's Section 1983 equal protection claim is appropriate.

## D.    Retaliation

A retaliation claim, like a workplace discrimination claim, is analyzed under the burden-shifting framework espoused by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tanvir v. New York City Health & Hospitals Corp.*, 480 Fed. App'x 620, 622 (2d Cir. 2012).  First, the plaintiff must establish a *prima facie* claim of retaliation by showing that: "(1) [s]he engaged in a protected activity; (2) the employer was aware of the protected activity; (3) the employer took adverse employment action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Id.* at 621-22 (citing *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003)).   As to the element of causation, "retaliation claims must be proved according to traditional principles of but-for causation…  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrong action or actions of the employer." *Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

"[O]nce the plaintiff has presented a *prima facie* case, the burden … shifts to the defendant to articulate, through the introduction of admissible evidence, a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 622 (citing *McDonnell*

*Douglas*, 411 U.S. at 802). "Once the employer has met this burden, the burden shifts back to the plaintiff to demonstrate that the nondiscriminatory reason was merely a pretext for discrimination." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

### 1. Overtime

Plaintiff contends that Defendants retaliated against her by limiting her opportunities to earn overtime compensation. However, she merely states what she earned in overtime compensation between 2011 and October 2013 and avers that certain male DPW employees earned more overtime compensation than her during this time period, while certain other male DPW employees – including CWs at the same level of seniority as Plaintiff – earned less. Plaintiff offers no information concerning the context of the varying overtime compensation amounts amongst various employees, and no information concerning her overtime compensation prior to 2011. Thus, there is no indication that an adverse employment action has occurred.

Additionally, Plaintiff fails to establish that her filing of the EEOC charge in August 2011 is the cause of the purportedly diminished overtime opportunities. In fact, Plaintiff traces her allegedly reduced overtime opportunities back to February 2010, when Beck asked her if she wanted to go to Atlantic City – an event she conceded was not romantic in nature during her deposition. In her written declaration (at ¶ 52), Plaintiff stated that, in February 2010, "[a]fter [she] refused … Beck's romantic advances, the very next day … Beck, together with … Spence, had [her] transferred from [her] then assignment at [one building], which provided ample opportunity to earn overtime compensation, to [another building], which provided almost no opportunity for overtime." Thus, even if Plaintiff has in fact received reduced overtime opportunities in recent years as compared with her DPW employment prior to 2011, a jury could not reasonably find that her engagement in a protected activity (filing an EEOC charge in August

2011) was the but-for cause, when she herself traces the cause back to an event in February 2010 unrelated to the filing of the EEOC complaint. Accordingly, summary judgment in favor of Defendants is granted as to Plaintiff's retaliation claim based upon loss of overtime.

### 2. Written Reprimand

Plaintiff contends that Spence's February 2012 written reprimand for using a County vehicle to attend a union meeting during her scheduled work hours and recording her time spent at that meeting as work time was an act of retaliation. In determining whether or not an alleged act of retaliation constitutes an "adverse employment action," the key question is "whether it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011) (quoting *Burlington Northern & Santa Fe R.R. Co. v. White,* 548 U.S. 53, 68 (2006)). "A reprimand may be considered an adverse employment action, and likewise could constitute a materially adverse action, depending on the context and severity of the reprimand." *Thomas v. iStar Financial, Inc.*, 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). It is important to consider whether the reprimand carries with it, or at least threatens, any negative real-world consequences. *Compare White v. Dep't of Corr. Services*, 814 F. Supp. 2d 374, 388 (S.D.N.Y. 2011) (discipline notice constituted adverse action where it "threatened severe consequences such as dismissal from service and loss of accrued annual leave, was placed in her personal history folder, and [plaintiff] had to pay $3000 to settle the disciplinary action"), *with Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001) (discipline notice did not constitute adverse action where plaintiff had not described "its effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing"), *and Wright v. Monroe Cmnty. Hosp.*, No. 09-cv-6593, 2011 WL 3236224, at *7

(W.D.N.Y. July 28, 2011) ("Employee investigations, unwanted scrutiny from supervisors, and negative performance evaluations without attendant negative results or deprivation of position/opportunity, do not sufficiently constitute adverse employment actions under Title VII."). The written reprimand that Plaintiff received in February 2011 was neither subjectively nor objectively severe enough to dissuade her from pursuing her discrimination claims. It did not threaten any further consequences, and, more than five (5) years on, has generated no adverse real-world consequences for Plaintiff. Accordingly, the February 2011 written reprimand did not constitute an "adverse employment action" sufficient to give rise to a viable retaliation claim.

Additionally, Plaintiff has failed to establish that her engagement in a protected activity was the but-for cause of the February 2012 written reprimand. Plaintiff seems to make the argument that the temporal proximity between her deposition in the EEOC proceeding and the reprimand gives rise to an inference of retaliation (*see* Pl. Opp. at 20), but fails to explain why the deposition should be the operative reference point rather than Plaintiff's filing of the EEOC charge in August 2011. Temporal proximity "is measured from the date of the employer's knowledge of [the] protected activity." *Kim v. Columbia Univ.*, 460 Fed App'x 23, 25 (2d Cir. 2012) (quoting *Clark Cnty. School Dist. V. Breeder*, 532 U.S. 268, 273 (2001)). While there is no definitive rule regarding the maximum amount of time between a protected activity and an adverse action that could give rise to an inference of retaliation, the six (6)-month gap between Plaintiff's initiation of the EEOC action and the written reprimand militates against inferring a causal link between the former and the latter. *See, e.g., Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find

the causal relationship.") (internal citations omitted). Accordingly, summary judgment in favor of Defendants is warranted with regard to this branch of Plaintiff's retaliation claim.

### 3. Delay in Restoration to CW III Position

Plaintiff no longer asserts that her underlying July 2012 demotion to CW I was an act of retaliation, but now contends that Beck retaliated against her by failing to file her application for reinstatement to CW III for her and falsely telling her that he did, thus delaying her reinstatement. This argument is without merit. The record is clear that Plaintiff had the ability to file her own application for reinstatement to CW III at all relevant times, and successfully did so in January 2013. Assuming her reinstatement to CW III was delayed at all, that delay was occasioned by Plaintiff's own inaction until January 2013, not her employer's action. Furthermore, Plaintiff's contention that she was only reinstated to CW III because she "went over … Beck's head and submitted [her] application directly to Civil Service" in January 2013 (Pl. Decl. ¶ 71) is belied by the fact that Beck actually signed the application, attesting to its contents, in January 2013. Accordingly, summary judgment in favor of Defendants is warranted with regard to this branch of Plaintiff's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated: May 17, 2016
      Central Islip, New York